**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 30, 2008

PATRICIA D. BRACKETT,

Plaintiff-Appellee,

v

No. 135375

FOCUS HOPE, INC., and ACCIDENT
FUND INSURANCE COMPANY OF
AMERICA,

Defendants-Appellants.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

This case requires us to consider whether plaintiff's refusal to attend an employer-mandated event constituted "intentional and wilful misconduct" under MCL 418.305, thereby barring her recovery of benefits under the Worker's Disability Compensation Act, MCL 418.101 *et seq*. The magistrate found that plaintiff willfully refused to attend the event, despite having been informed that the event was essential in promoting the employer's goal of racial reconciliation. In light of that finding, we conclude that plaintiff's refusal to attend the mandatory event constituted intentional and willful misconduct, thereby barring workers'

compensation benefits under MCL 418.305. We thus reverse the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

Defendant Focus Hope, Inc., hired plaintiff as a full-time employee in January 2001. Defendant's cofounder and chief executive officer, Eleanor Josaitis, told plaintiff that the mission of Focus Hope is to seek racial equality and reconciliation. Josaitis further explained that the most important function of the year is the Martin Luther King, Jr., birthday celebration, and that each employee was expected to attend the event. If the employee had a legitimate excuse for not attending, the employee was to inform the human resources department.

The King Day event was ordinarily held in Detroit, but in 2002, Josaitis decided to hold it in Dearborn. Plaintiff told her immediate supervisor, David Lepper, that she would not attend the event in Dearborn because she and her family had bad experiences there as African-Americans and because she believed the history of race relations in Dearborn was not in keeping with Dr. King's aspirations. Lepper advised plaintiff that she would be docked one day's pay for refusing to attend. Plaintiff did not tell Josaitis or the human resources department of her decision not to attend.

After the King Day event, Josaitis met with plaintiff, Lepper, and a human resources manager. Josaitis asked plaintiff why she had not attended the King Day celebration. Plaintiff explained that she believed the site of the event in Dearborn was not appropriate. Josaitis responded that plaintiff had been informed when she

2

was hired that attendance at the King Day event was mandatory, and that the purpose of Focus Hope was to promote acceptance and tolerance. Josaitis advised plaintiff that she would be docked for two days' pay. Subsequently, some of plaintiff's job responsibilities were taken away.

Plaintiff and Josaitis then exchanged memos explaining their respective positions. Josaitis wrote in her memo that plaintiff's failure to attend the King Day event had reduced her confidence in plaintiff's commitment to Focus Hope's goals. Josaitis explained:

> The purpose of the Civil Rights movement was to change the negative perception and prejudice of any individual towards another, based on race, gender, religion, color, or creed through the use of non-violent action. Father [William] Cunningham and I started Focus: HOPE based on this same philosophy that Dr. King gave his life for. Just as I stated to you in your orientation, I expect Every Focus: HOPE Colleague to abide by these same principles.
>
> To harbor such feelings of the past without thinking how our MLK mandatory staff development day helps to move Focus: HOPE into the future, reduces my confidence in your commitment to help us fulfill our mission statement.

In her memo, plaintiff admitted that she understood that attendance at the King Day event was mandatory, but stated that she "felt offended by the celebration being in a city that I do not frequent and that I would be extremely uncomfortable celebrating Martin Luther King's birthday [in]." She added, "I did not attend the celebration and expressed [in the meeting] that I spent it with my family and with no regrets accepting the day off with no pay!" Plaintiff then

3

wrote, "I do not accept [Josaitis's] judging and wrongfully degrading my character as a [sic] 'untrustworthy person.'"

Plaintiff claims that a second meeting occurred in which Josaitis allegedly reiterated her disappointment in plaintiff, shook her finger in plaintiff's face, and said that plaintiff did not deserve to receive a paycheck from Focus Hope. When plaintiff asked if she was being fired, Josaitis shrugged her shoulders and let her out of the office. Josaitis testified that she remained calm and that she did not yell or threaten to fire her.

Plaintiff claimed that Josaitis's alleged comments traumatized her. Plaintiff left work and never returned. Her psychologist opined that plaintiff suffered a major depression precipitated by work events and that she is unable to work. A defense psychiatrist found no evidence of a continuing mental disability and opined that plaintiff could return to work without restrictions.

The workers' compensation magistrate credited the testimony of plaintiff and her psychologist. The magistrate found that plaintiff's mental disability arose from actual employment events and that plaintiff's perception of those events was reasonable.[1] Although the magistrate found that plaintiff had willfully refused to attend the King Day event, and that her disability had resulted from that willful

---

[1] The magistrate reached this conclusion in spite of his "personal" view that "the reaction of Ms. Brackett to these events and her reasonable perceptions thereof (i.e., experiencing a major depressive episode causing disability for more than two years) is excessive bordering on outlandish."

refusal, the magistrate nonetheless rejected the defense argument that plaintiff's misconduct barred her recovery of benefits under MCL 418.305. The magistrate stated that "[t]he kind of 'misconduct' plaintiff engaged in here is a far cry from the alleged misconduct [i.e., sexual harassment] alleged in *Daniel* [*v Dep't of Corrections*, 468 Mich 34; 658 NW2d 144 (2003)], and for that reason I decline to follow" *Daniel*.

The Workers' Compensation Appellate Commission (WCAC) affirmed. It chastised defendant as "insensitive" for failing to recognize that plaintiff's agreement to attend King Day celebrations would not require her to attend such events in Dearborn. Thus, the WCAC found "absolutely no merit to defendants' claim that plaintiff's behavior should disqualify her for benefits pursuant to the doctrine set forth in" *Daniel*.

The Court of Appeals denied leave to appeal for lack of merit,[2] but this Court remanded the case to the Court of Appeals for consideration as on leave granted, in light of *Daniel*.[3] On remand, the Court of Appeals affirmed the WCAC decision.[4] The Court of Appeals determined that sufficient evidence supported the finding that plaintiff's conduct was a "far cry" from the misconduct in *Daniel*. Citing *Andrews v Gen Motors Corp*, 98 Mich App 556; 298 NW2d 309

---

[2] Unpublished order of the Court of Appeals, entered April 28, 2006 (Docket No. 266018).

[3] 477 Mich 922 (2006).

[4] Unpublished opinion per curiam of the Court of Appeals, issued October 23, 2007 (Docket No. 274078).

(1980), the Court of Appeals concluded that plaintiff's conduct fell within the realm "in which a claimant perhaps violates a workplace rule or expectation but is not precluded by § 305 from recovering benefits for a resulting injury."[5]

Defendants again applied for leave to appeal to this Court. We scheduled the case for oral argument on the application, directing the parties to address "whether plaintiff's injury resulted from her willful misconduct."[6]

## II. STANDARD OF REVIEW

In the absence of fraud, this Court must consider the WCAC's findings of fact conclusive if any competent evidence in the record supports them. MCL 418.861a(14); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 698; 614 NW2d 607 (2000). We review de novo questions of law, including statutory interpretation. *Karaczewski v Farbman Stein & Co*, 478 Mich 28, 32; 732 NW2d 56 (2007); *Daniel*, *supra* at 40.

## III. ANALYSIS

MCL 418.305 provides: "If the employee is injured by reason of his intentional and wilful misconduct, he shall not receive compensation under the provisions of this act." "This provision has remained essentially unchanged since it was first adopted by the Legislature in 1912 as part of the original workers' compensation legislation. See 1912 (1st Ex Sess) PA 10, part 2, § 2." *Daniel*,

---

[5] *Id*. at p 2.
[6] 480 Mich 1147-1148 (2008).

6

*supra* at 41. The question here is whether plaintiff's refusal to attend an employer-mandated event, a refusal that the magistrate specifically found to be "willful," constitutes "intentional and wilful misconduct" that bars recovery of workers' compensation benefits.

Our fundamental obligation when interpreting a statute is to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). An undefined statutory term must be accorded its plain and ordinary meaning. MCL 8.3a; *People v Thompson*, 477 Mich 146, 151; 730 NW2d 708 (2007). A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning. *Id*. at 151-152. A legal term of art, however, must be construed in accordance with its peculiar and appropriate legal meaning. MCL 8.3a; *Mayberry v Gen Orthopedics, PC*, 474 Mich 1, 7; 704 NW2d 69 (2005). In this case, we need not determine whether the statutory phrase "intentional and wilful misconduct" is a common phrase or a legal term of art because the terms in the phrase are similarly defined in both a lay dictionary and a legal dictionary.

"Intentional" is defined as "done with intention or on purpose." *Random House Webster's College Dictionary* (1991). "Willful" is defined as "deliberate, voluntary, or intentional." *Id*. "Willful implies opposition to those whose wishes, suggestions, or commands ought to be respected or obeyed: a willful son who ignored his parents' advice." *Id*. "'"[W]illful" means action taken knowledgeably

7

by one subject to the statutory provisions in disregard of the action's legality. No showing of malicious intent is necessary. A conscious, intentional, deliberate, voluntary decision properly is described as willful, "regardless of venial motive."'" *People v Hegedus*, 432 Mich 598, 605 n 7; 443 NW2d 127 (1989) (citations omitted). "Misconduct" is defined as "improper behavior." *Random House Webster's College Dictionary* (1991). Therefore, conduct is "intentional and wilful misconduct" if it is "improper" and done "on purpose" despite the knowledge that it is against the rules.

Likewise, Black's Law Dictionary (7th ed) defines "intentional" as "[d]one with the aim of carrying out the act," and it defines "willful misconduct of employee" as "[t]he deliberate disregard by an employee of the employer's interests, including its work rules and standards of conduct, justifying a denial of unemployment compensation if the employee is terminated for the misconduct."

And, indeed, in the past, our Court has approached the definition of "willful misconduct" with this understanding. In *Detwiler v Consumers Power Co*, 252 Mich 79; 233 NW 350 (1930), this Court defined "willful misconduct" as an employee's "obstinate or perverse opposition to the will of the employer."

In *Detwiler*, the plaintiff's husband was killed in a freight elevator accident at work. Another employee had "cautioned" the decedent against using the elevator because it was dangerous, but the employer had no rule barring its use. This Court rejected the employer's argument that the decedent's use of the elevator constituted intentional and willful misconduct:

8

Assuming, but not deciding, that wilful misconduct might consist in wilful violation of a rule made for the employee's own safety or the safety of others, the record shows no such rule. A rule, to be effective as such, must be prescribed by a power having authority to make rules and it must be enforced with diligence.

If it be conceded, for sake of argument, that the instruction or caution here was duly authorized, as contended by the employer, still it appears that it was not enforced, obedience was not required, and it is unavailing in respect of wilful misconduct. It was well said in *Haffemayer* v. *United Keanograph Film Co.*, 1 Cal. Ind. Acc. Comm. Dec. (No. 24, 1915) 58, as reported in 8 N.C.C.A. 891:

"To disregard the instructions of an employer, where such instructions are given merely in the form of cautions, and where repeated violations of such instructions are known and permitted without penalty and without positive insistence upon obedience, does not constitute such *obstinate or perverse opposition to the will of the employer as amounts to wilful misconduct*. To hold otherwise would be to open the door for employers to impose numbers of safety rules upon their employees with a tacit understanding that such rules need not, so far as the employers were concerned, be regarded if the employees chose to do otherwise, but that if an employee was injured while disobeying any such instructions he should be deprived of compensation. An employer can not be allowed to impose two standards of care upon his employees, one for the ordinary conduct of his business and the other as a test of liability under the workmen's compensation * * * act in case of accident." [*Id*. at 81-82 (emphasis added).]

The *Detwiler* Court's adoption of the "obstinate and perverse opposition to the will of the employer" definition is useful in according meaning to the entire statutory phrase "intentional and wilful misconduct." Under this standard, § 305 bars an employee from recovering benefits for misconduct that is both (1) intentional, i.e., deliberate or nonaccidental, and (2) willful, i.e., obstinately or perversely opposed to the employer's will. An employer's work rule must be clearly established and consistently enforced in order for the employee to

9

understand the mandatory nature of the rule and for its violation to constitute intentional and willful misconduct. *Detwiler*, *supra* at 81-82.

The *Detwiler* analysis is consistent with our recent decision in *Daniel*. In *Daniel*, the Department of Corrections suspended the plaintiff, a probation officer, for sexually harassing female attorneys. After returning to work, the plaintiff suffered a mental disability because he felt harassed by his supervisor and the female attorneys. This Court concluded that the plaintiff was injured by reason of his intentional and willful misconduct. *Daniel*, *supra* at 44. Further, this Court rejected the Court of Appeals majority's conclusion that the misconduct did not rise to a sufficient level of moral turpitude to be "'intentional and wilful.'" *Id*. at 45.

Similarly, the facts found by the magistrate and the WCAC in this case establish that plaintiff's refusal to attend the King Day event constituted intentional and willful misconduct. Attending this event was a mandatory requirement for Focus Hope employees. Josaitis personally interviews every prospective employee and impresses on them the necessity to attend the King Day event. The magistrate specifically found that plaintiff's refusal to attend the event was willful. Plaintiff did not challenge this finding, and the WCAC did not disturb it. This finding is supported by evidence in the record. Therefore, we must treat as conclusive the WCAC's finding that plaintiff's refusal to attend was willful. *Mudel*, *supra*. Plaintiff's deliberate and categorical refusal to attend this mandatory function constituted insubordination.

In concluding that plaintiff's misconduct was not excluded by MCL 418.305, the Court of Appeals agreed with the WCAC that, unlike the sexual harassment in *Daniel*, plaintiff's conduct perhaps violated a workplace rule but was insufficiently serious to preclude benefits under § 305. The Court of Appeals cited *Andrews*, in which the Court of Appeals stated that misconduct must involve some unspecified degree of "moral turpitude" in order to bar recovery. The *Andrews* Court relied on *Crilly v Ballou*, 353 Mich 303, 327; 91 NW2d 493 (1958), in which this Court asserted in dictum that the statute excluded from coverage "acts of a degree of moral turpitude," equating intentional and willful misconduct with acts of a "gross and reprehensible nature."

The dictum in *Crilly* essentially engrafts a "moral turpitude" requirement onto § 305. The dictum is thus inconsistent with the plain statutory language, *Detwiler*, and *Daniel*. The text of § 305 does not create a sliding scale of "moral turpitude" that tribunals may assess in deciding whether to apply the statutory exclusion. Rather, the statute simply excludes benefits where the injuries arose by reason of the employee's intentional and willful misconduct. Moreover, this Court in *Daniel* rejected the Court of Appeals majority's conclusion in that case that the misconduct did not rise to a level of moral turpitude that was intentional and willful. We held that the plaintiff's repeated acts of sexual harassment were voluntary and went beyond negligence or gross negligence.

The same analysis applies here. Plaintiff willfully refused to attend her employer's most important function. She did so in the face of an express

11

requirement that she attend, and did so even though the location of the event was an essential part of her employer's overall mission. Plaintiff's refusal to follow her employer's clearly expressed rule constituted an "obstinate or perverse opposition to the will of the employer." She was disciplined for this misconduct. As in *Daniel*, it is undisputed that her mental disability flows directly from the employer-imposed discipline for misconduct.

## IV. RESPONSE TO THE DISSENT

The dissent contends that plaintiff was "selectively singled out for harsh punishment" because approximately 50-60 other employees allegedly refused to attend the event in Dearborn. But neither the magistrate nor the WCAC found that plaintiff was singled out for punishment, and the record does not support such a finding. Plaintiff presented no evidence other than her own vague, contradictory, and—by her own admission—speculative testimony to suggest that other employees refused to attend the event but were not punished.

Plaintiff initially testified that "50 to 60" of her colleagues "had adverse opinions about that particular site." She later claimed that "there was like 80 people. [Eighty to ninety] people or something that didn't attend. I forgot the people – the numbers, but there was more than myself – then I was called by Human Resources." Still later, on cross-examination, plaintiff contended that she "was the only person out of 80" to be questioned about her failure to attend, then added, "I think there was two of us." When asked how she knew this, plaintiff

12

responded, "I guess it's speculation." Plaintiff did not present testimony from or even identify any of the other employees who allegedly refused to attend.

Even if plaintiff had shown that other employees did not attend the event, she offered no proof that any such employees failed to provide a legitimate excuse to the human resources department before the event, as defendant required, and that those employees then went unpunished despite their disobedience. Thus, the dissent's assertion that plaintiff was "singled out for harsh punishment" is wholly unsupported in the record.

Next, the dissent contends that "the 'harm' that Ms. Brackett suffered was not caused by the initial response by her supervisor, but by the director's harsh personal censure of Ms. Brackett." *Post* at 3. This hyperbolic criticism of Ms. Josaitis has no basis in the record or in the findings of the magistrate and the WCAC. The lower tribunals simply did not find that Josaitis engaged in a "harsh personal censure." It is most regrettable that our dissenting colleagues have chosen to lob these unfounded accusations.

Moreover, the dissent's unfounded accusations do not reflect plaintiff's documented, ongoing insubordination in which she continued to oppose the mandatory attendance at the King Day event. In her memo to Josaitis following the initial meeting, plaintiff expressed no remorse. On the contrary, plaintiff continued to insist that she should not be required to attend the event in Dearborn because she "felt offended by the celebration being in a city that I do not frequent" and in which she "would be extremely uncomfortable celebrating Martin Luther

13

King's birthday." Plaintiff admitted that she had "no regrets accepting the day off with no pay!" And referring to Josaitis, plaintiff stated, "I do not accept her judging and wrongfully degrading my character as a [sic] 'untrustworthy person.'" The dissent's excessive criticism of Josaitis thus appears quite shortsighted where plaintiff (1) violated Focus Hope's rule by refusing to join the King Day celebration, (2) admitted her knowledge that attendance was mandatory, and (3) continued to express her lack of remorse for skipping the event.

And as the dissenting justices invent unfounded criticisms of the cofounder of Focus Hope, they fail to give effect to the magistrate's findings that plaintiff "actually did willfully not attend the Defendant's M L King Day Celebration" and that "[s]he actually did suffer disciplinary action *on account thereof.*" (Emphasis added.) The dissent's effort to disconnect plaintiff's misconduct from her resulting disability is therefore unavailing and contrary to the magistrate's own findings.

Next, the dissent endorses the Court of Appeals assertion that plaintiff's "pre-arranged non-attendance" was not misconduct. *Post* at 5. But Focus Hope required employees to provide a legitimate excuse to the human resources department, and it is undisputed that plaintiff did not inform the department of her absence before the event. Although plaintiff did inform Lepper, her immediate supervisor, of her decision not to attend, plaintiff knew that she was violating a rule because Lepper told her that she would be docked a day's pay. The dissent does not explain how plaintiff's acceptance of a penalty for violating the rule

14

excuses or negates her violation of the rule, nor does the dissent explain how the fact that plaintiff was ultimately docked for two days' pay rather than one negates the existence of the rule. The rule existed and was violated regardless whether plaintiff was docked for one day or two days.

It is important to recall that plaintiff was not fired for her refusal to attend the King Day event. Rather, plaintiff claims that she remains indefinitely unable to work because of a major depressive episode arising from the events surrounding her punishment, including having her pay docked for two days instead of one. We note that the magistrate himself found plaintiff's alleged reaction to these events to be "excessive bordering on outlandish."

The dissent accuses the majority of concluding that plaintiff's misconduct in this case was "equivalent" to the misconduct that occurred in *Daniel*. *Post* at 1-2, 6. But we have expressed no such view. A claimant's misconduct does not have to be "equivalent" to the misconduct that occurred in *Daniel* in order to bar the plaintiff from recovering workers' compensation benefits. Rather, under MCL 418.305, the plaintiff is barred from recovering benefits if the misconduct was "intentional and wilful." The statute does not require equivalence to the misconduct in *Daniel*.

The dissent states that we have "nonsensically" concluded that an employee's intentional and willful misconduct bars workers' compensation benefits "regardless of whether the rule is controversial and whether it is properly and uniformly enforced." *Post* at 6. As we have explained above, however, there

15

is no evidence that Focus Hope did not properly or uniformly enforce its rule. Other than her own admitted speculation, plaintiff presented no evidence that other employees failed to attend the event, failed to inform the human resources department, and then went unpunished for their misconduct.

Moreover, MCL 418.305 contains no exception that would allow employees to intentionally and willfully violate employer rules that a workers' compensation tribunal or appellate court later deems "controversial." The dissent has invented this exception out of whole cloth. It is not clear on what authority the dissent would permit tribunals or courts to find that an employer's rule is "controversial" and to then disregard the plain language of MCL 418.305 on the basis of that finding. Nor is it clear whether or how the dissent believes that a tribunal or court would possess the institutional capacity to decide on a principled basis what is or is not "controversial." And even if the Legislature had adopted a "controversial" rule exception in MCL 418.305, the dissenting justices do not explain why they find it "controversial" to celebrate Dr. King's birthday in a way that promotes Focus Hope's goal of racial reconciliation.

Finally, the dissent fundamentally distorts the nature of Focus Hope's rule by questioning whether "there was a well-established work rule to hold the event in Dearborn, as opposed to Detroit." *Post* at 3. But plaintiff concedes that when she was hired, she was told by Josaitis that all employees were expected to attend the King Day celebration, and that this celebration was the most important event of the year for Focus Hope. Plaintiff accepted her position with full knowledge

16

that she was required to attend the event. In 2002, Josaitis held the event in Dearborn to further Focus Hope's goals of racial reconciliation and healing past wounds. During her testimony, Josaitis quoted the Focus Hope mission statement, which provides:

> Recognizing the dignity and beauty of every person, we pledge intelligent and practical action to overcome racism, poverty and injustice. And to build a metropolitan community where all people may live in freedom, harmony, trust and affection. Black and white, yellow, brown and red from Detroit and its suburbs of every economic status, national origin and religious persuasion we join in this covenant.

Josaitis testified that "every single person that comes to Focus Hope, the first question that they're asked is do you have any philosophical difference with that mission statement. That mission statement is on the back of all of our business cards, it hangs on every wall."

Josaitis testified that the mission statement fit into the King Day celebration because "Martin Luther King was a man that was trying to build bridges. . . . So, on Dr. King day we always came together to talk about the history of civil rights and where we were going into the future." She further explained that "*every single* person that comes to work for Focus Hope goes through a two-hour orientation with me and then they go through an orientation with the Human Resources Department and every single person is told that it is mandatory and why it is so important." (Emphasis in original.) It is undisputed that plaintiff went through this orientation.

17

Focus Hope's mission statement articulates goals and ideals that are not limited to the geographical boundaries of one city. Indeed, the mission statement expressly refers to "Detroit *and its suburbs*" and to the "*metropolitan community*." (Emphasis added.) Plaintiff had full notice of the mission statement when she agreed to work for Focus Hope, and the 2002 celebration was held in Dearborn to advance those goals. Therefore, the dissent's effort to confine Focus Hope's celebration of Dr. King's birth to a Detroit-only venue is wholly unconvincing.

## V. CONCLUSION

For these reasons, we hold that plaintiff's injury arose out of her intentional and willful misconduct in refusing to attend an employer-mandated event. We reaffirm the holding in *Daniel* and reject the insertion of a "moral turpitude" requirement into the text of MCL 418.305. Accordingly, the judgment of the Court of Appeals is reversed.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young
Stephen J. Markman

18

S T A T E   O F   M I C H I G A N

SUPREME COURT

PATRICIA D. BRACKETT,

      Plaintiff-Appellee,

v                                No. 135375

FOCUS HOPE, INC., and ACCIDENT
FUND INSURANCE COMPANY OF
AMERICA,

      Defendants-Appellants.

_____

WEAVER, J.  (*dissenting*).

I dissent from the decision of the majority of four (Chief Justice Taylor and Justices Corrigan, Young, and Markman) to reverse the judgment of the Court of Appeals on the ground that the plaintiff's refusal to attend a mandatory employee event constituted "intentional and wilful misconduct" under MCL 418.305, thereby barring her recovery of benefits under the Worker's Disability Compensation Act, MCL 418.101 *et seq*.

The majority of four, in reversing the decisions reached by the magistrate, the Workers' Compensation Appellate Commission (WCAC), and the Court of Appeals, has supplanted the very well-reasoned findings reached by the aforementioned entities with its own nonsensical conclusion that the "intentional and wilful misconduct" engaged in by the plaintiff in this case was equivalent to the "intentional and wilful misconduct" that occurred in *Daniel v Dep't of*

*Corrections,* 468 Mich 34; 658 NW2d 144 (2003). Having authored *Daniel,* I take issue with the majority's unfounded conclusion and instead agree that the "plaintiff's decision to not attend the Martin Luther King celebration in Dearborn . . . was 'a *far cry*' from the probation officer's sexual harassment in *Daniels* [sic]."[1] Consequently, I agree with the decision reached by the Court of Appeals affirming the magistrate and WCAC's award of benefits to the plaintiff.

A brief recitation of the facts illustrates the distinction between the employee misconduct that occurred in *Daniel*[2] and the employee action that occurred here. The plaintiff, Patricia D. Brackett, worked for defendant Focus Hope in Detroit. Focus Hope's mission statement emphasizes the importance of following the teachings of Martin Luther King, Jr. During her hiring interview, Ms. Brackett was advised that she would be required to attend a Focus Hope event on Martin Luther King, Jr., Day. Because the Martin Luther King Day celebrations had always been held in Detroit, Ms. Brackett had no reason to believe at the time she was hired that she would be required to attend the event in the city of Dearborn. However, in 2002, the year that Ms. Brackett was employed by Focus Hope, the director, Eleanor Josaitis, decided to hold the event not in

---

[1] *Brackett v Focus Hope, Inc,* unpublished opinion per curiam of the Court of Appeals, issued October 23, 2007 (Docket No. 274078) (emphasis added).

[2] The claimant in *Daniel* was a male probation officer employed by the Michigan Department of Corrections. The basis for denying workers' compensation benefits to the claimant in *Daniel* was the probation officer's blatant and repeated sexual harassment of several female defense attorneys.

Detroit, but in Dearborn, in an effort to promote Focus Hope's goal of racial reconciliation. Ms. Brackett testified that the decision was a topic of open discussion among Focus Hope employees. Approximately 50 to 60 Focus Hope employees, including Ms. Brackett, who is African-American, believed the event should not be held in Dearborn.

Speaking personally about her objections to holding the event in Dearborn, Ms. Brackett testified that she voiced her concerns to her immediate supervisor given her own family's past experience in the community. Indeed, evidently the Focus Hope director's desire to hold the event in Dearborn, instead of Detroit, was based in part on her decision to expand the scope of Focus Hope's policy by carrying Focus Hope's message into a new realm, an area that Ms. Brackett testified was "not a good fit" for her.

While the majority equates the "misconduct" that occurred here with the sexual harassment misconduct that occurred in *Daniel,* it is not even clear that there was a well-established work rule to hold the event in Dearborn, as opposed to Detroit. Therefore, it cannot be said that Ms. Brackett violated a well-established work rule.

Moreover, the "harm" that Ms. Brackett suffered in this case was not caused by the initial response by her supervisor, but by the director's harsh personal censure of Ms. Brackett. Specifically, Ms. Brackett notified her immediate supervisor that she objected to attending the event in Dearborn and her supervisor told her she would be docked one day's pay for her refusal to attend.

Ms. Brackett accepted this reprimand. It was not until after the Dearborn event that Ms. Josaitis harshly censured Ms. Brackett for refusing to attend. Ms. Brackett asserts that Ms. Josaitis and she had a "one-on-one" meeting, during which time the director told Ms. Brackett she was disappointed by Ms. Brackett's lack of loyalty and that she had lost faith in her as a Focus Hope employee.

In addition, instead of docking Ms. Brackett's pay for only one day, which was the accepted punishment dictated by Ms. Brackett's supervisor, the director informed Ms. Brackett that she would be docked two days' pay. During this meeting, Ms. Brackett further alleges that Ms. Josaitis shook her finger in Ms. Brackett's face and told her that she did not deserve a check from Focus Hope. When Ms. Brackett then asked if she was being fired, Ms. Josaitis simply shrugged her shoulders and left the room.

As a result of this confrontation, Ms. Brackett left the job that day and has not returned since. She was deeply upset by the incident and a psychiatrist diagnosed her as suffering from disabling depression as a result of the harsh reprimand by the director.

Given the fact that Ms. Brackett testified that 50 to 60 other Focus Hope employees did not attend the Martin Luther King Day celebration in Dearborn, and there was no evidence that these employees were also singled out and reprimanded in the same harsh manner as Ms. Brackett, it is questionable whether *Daniel* even applies. *Daniel* states that "MCL 418.305 does not operate to preclude benefits where an employee was injured while violating a work rule that

4

had not been enforced by the employer." *Id*. at 46-47. Because it appears that Ms. Brackett was selectively singled out for harsh punishment, it is questionable whether this work rule was strictly enforced across the board.

All the lower tribunals that dealt with this case declined to deem Ms. Brackett's decision not to attend the celebration in Dearborn as "misconduct." Although the magistrate found that Ms. Brackett "actually did willfully not attend the defendant's M L King Day celebration," he made that determination in the context of discussing Ms. Brackett's perceptions of workplace events. In deciding whether Ms. Brackett should be denied benefits under MCL 418.305, the magistrate used the word "misconduct" in quotation marks and refused to follow *Daniel*, ruling that the conduct at issue in this case was "a far cry" from that in *Daniel*. The WCAC specifically stated that to call Ms. Brackett's actions "misconduct" was "clearly unreasonable" because she should not have been expected to attend the celebration in Dearborn. The Court of Appeals agreed that Ms. Brackett's "pre-arranged non-attendance" was not misconduct. *Brackett, supra* at 2.

Additionally, the magistrate found that Ms. Josaitis's reaction amounted to a "chastisement" of Ms. Brackett, whom she accused of having "broken trust" with the organization and with Ms. Josaitis herself. Neither the open discussions among the employees of Focus Hope about the propriety of holding the celebration in Dearborn nor Ms. Brackett's discussion with her supervisor about

5

the one-day-pay sanction had prepared Ms. Brackett for Ms. Josaitis' severe criticism and loss of trust in her, which accompanied the decision to dock her two days' pay. Notably, the magistrate did not find that Ms. Brackett was injured by Ms. Josaitis's enforcement of the rule through the increased pay sanction. Rather, he found that she was injured by Ms. Josaitis's expressed personal disappointment, lack of trust, and loss of confidence in Ms. Brackett. Thus, it is questionable whether Ms. Brackett's mental injury resulted from the proper enforcement of a workplace rule.

Given the evidence tending to show that Ms. Brackett was singled out for harsh criticism, and the fact that her "misconduct" here does not equate to the "intentional and wilful" sexual harassment that occurred in *Daniel,* I dissent from the majority of four's decision to reverse and thereby deprive Ms. Brackett of disability benefits. The magistrate, the WCAC, and the Court of Appeals all concluded that the rule in *Daniel* should not be extended to this case. The majority of four instead nonsensically concludes that an employee's decision not to follow a work rule amounts to so-called "intentional and wilful misconduct" and precludes workers' compensation benefits regardless of whether the rule is controversial and whether it is properly and uniformly enforced. Consequently, I agree with the decision reached by the Court of Appeals affirming the magistrate and WCAC's award of benefits to the plaintiff.

As a final point, I note that given the vastly divergent factual scenarios presented in this case and in *Daniel,* the majority of four should, at the very least,

6

have granted the application for leave to appeal in order that the parties and the Court would have the benefit of full briefing and argument on this important question.

Elizabeth A. Weaver
Michael F. Cavanagh
Marilyn Kelly